IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

BRENT JACOBY,                          :

      Plaintiff,                          :

v.                                      :       CIVIL ACTION 12-00640-CG-N

BALDWIN COUNTY, et al.,                :

      Defendants.                        :


## REPORT AND RECOMMENDATION

      Plaintiff, an Alabama prison inmate proceeding pro se and in forma pauperis, filed a

complaint under 42 U.S.C. § 1983. This action was referred to the undersigned pursuant to 28

U.S.C. § 636(b)(1)(B) and Local Rule 72.2(c)(4), and is now before the undersigned on

Defendants' Motion for Summary Judgment (Docs. 36, 43), Plaintiff's Motion for Summary

Judgment (Doc. 56), and Plaintiff's Motion for a Substitution of Parties (Doc. 72). For the

reasons stated below, it is recommended that Defendants' Motion for Summary Judgment be

granted, that Plaintiff's Motion for Summary Judgment be denied, and that Plaintiff's claims

against Defendants be dismissed. It is also recommended that Plaintiff's Motion for a

Substitution of Parties be granted.

## I.    SUMMARY OF ALLEGATIONS

      From August 12, 2012 to September 5, 2012, the dates the alleged constitutional

violations took place, Plaintiff was a pretrial detainee in the Baldwin County Correctional Center

charged with burglary, theft of property, possession of a forged instrument, possession of a

concealed weapon without a permit, and possession of a firearm by a convicted felon. (Doc. 1,

pp. 2-3; Doc. 36, p. 4). At the outset, this Court notes that this is not Plaintiff's first rodeo. Plaintiff's adult life seems, thus far, to have followed an established pattern of commit a crime, go to jail, get disciplined, file a grievance, file a § 1983 action, get released, and repeat. See Jacoby v. Moscicki, 07-00342-HBS (W.D.N.Y. Sept. 12, 2008), Jacoby v. Buncombe County Drug Treatment Program, No. 1:09CV304-03-MU, 2009 WL 2517008 (W.D.N.C. Aug. 13, 2009), Jacoby v. County of Oneida, New York, No. 9:05-CV-1254 (FJS/GJD), 2009 WL 2971537 (N.D.N.Y. Sept. 11, 2009), Jacoby v. Phelix, No. 9:07-CV-872 (DNH/ATB), 2010 WL 1839299 (N.D.N.Y. March 31, 2010), Jacoby v. Sears, CA 07-00872-ATB (N.D.N.Y. Mar. 28, 2011), Jacoby v. Fischer, CA 10-00920-HBS (W.D.N.Y. pending), Jacoby v. Baldwin County, Civ. A. No. 12-366-CG-C, 2012 WL 6728263 (S.D. Ala. Nov. 29, 2012), Jacoby v. Conway, No. 10CV920, 2013 WL 1559292 (W.D.N.Y. Apr. 10, 2013), Jacoby v. Baldwin County, Civ. A. No. 12-0197-WS-M, 2013 WL 2285108 (S.D. Ala. 2013). The present case is the third of four § 1983 cases Plaintiff filed during the time he spent at the Baldwin County Correctional Center awaiting trial and sentencing. See also Jacoby v. Mack, Civ. A. No. 13-0070-KD-B.

In this case, the relevant, undisputed facts, taken in the light most favorable to Plaintiff, show as follows: During the early to middle part of August of 2012, Plaintiff asserts that he approached Sergeant Griffith about working undercover for him to bring down crooked officers and drug smuggling inmates in the jail. (Doc. 1, p. 3). During this meeting, Plaintiff told Griffith that he used drugs and tobacco products while at the jail, and he voluntarily turned over a small bag of spice weed and tobacco to give him more credibility. (Id.) According to Plaintiff, it was agreed that Plaintiff would email Griffith once he found out something about drugs and Griffith would then in return contact the district attorney's office on his behalf to put a word in for him to get some leniency in his sentencing. (Doc. 1, pp. 3-4).

On August 12, 2012, Plaintiff notified Griffith by email that spice, several prescription drugs, and cigarettes came in to the block. (Doc. 1, p. 4). Plaintiff ate Seroquel to sleep, smoked, and helped another inmate bag up the drugs to distribute for money while he waited on Griffith's response. (Id.) At approximately 1:15 p.m., Defendant Morse noticed a horrible smell coming from the G-Block area, where Plaintiff's cell was at the time, so he and two other officers went into the block to investigate. (Doc. 40-1, p. 7). After speaking with Plaintiff, they thought he was acting and talking strangely so Defendant Means, the shift supervisor, instructed the two officers to take him to medical for a urine test. (Id.) Plaintiff claims he did not know at the time that this was a drug test and that he did not consent to a drug test. (Doc. 1, p. 4). The urine test was positive for cocaine. (Doc. 40-1, p. 7). Plaintiff told Palmer, Arnold, and the nurse that administered the test that he ate Seroquels and argued unsuccessfully that Seroquel can cause a false positive test for cocaine. (Id.) Arnold and Palmer took him to segregation without his property, a mattress, or sheets and put him in a cell with two other inmates. (Id.)

The next day, Plaintiff received a copy of the charges based on the drug test and a copy of a misbehavior charge regarding a separate incident involving a weapon that he was found to have possessed. (Id.) According to Plaintiff, he was not provided a copy of the written narratives with these charges. However, the misbehavior reports he received did clearly state what each charge was. (Doc. 40-1, pp. 8, 13). Plaintiff started refusing all medications at this time and started writing grievances and complaints to Major Byrne and Sergeant Griffith about the way he felt betrayed, let down, and set up and complaining about his living conditions in segregation. (Doc. 1, p. 4-5). Plaintiff was forced to sleep his first night in segregation on the floor with no mattress and sheets, and all of his property was missing when his bag was brought to him. (Doc. 1, p. 5). According to Plaintiff, he had to sleep on the floor next to the toilet

because the cell was a two-man cell with three inmates in it. (Id.) He caught dermatitis and/or a foot rash from being housed in a nasty environment due to lack of cleaning supplies and hygiene products. (Id.) Pursuant to the Inmate Handbook, inmates in disciplinary segregation lose all day room privileges, visitation, recreation, and commissary use and are allowed only a Bible or Koran as reading material. (Doc. 41-1, p. 12). The inmates in segregation are limited to two stamped envelopes, one pad of paper, and one pen per week. (Doc. 1, p. 5). Although Plaintiff claims he had to put legal work on the back burner due to this, the Court notes that he was able to file and maintain four separate actions in this Court, filing hundreds of pages of motions and briefs, during the relatively brief time he spent in the Baldwin County Correctional Center. (Id.)

On August 15, 2012, Plaintiff had his disciplinary hearing for the failed urine test. (Id.) One of the three officers on the hearing board was Arnold, one of the officers who had taken Plaintiff to be tested. (Id.) Defendant Morse was the arresting officer. (Doc. 40-1, p. 8). Plaintiff explained to the hearing board that Sergeant Griffith was aware that he got high and that he was working on drug busts with Griffith. (Doc. 1, p. 8). He wanted to call Griffith as a witness, but they refused to let him. (Id.) The hearing was not recorded despite his request. (Id). Plaintiff argued at the hearing that he never consented to the urine test, that the urine was never sent off to a lab for testing, and that the Seroquel he had taken resulted in a false positive test for cocaine. (Id). Plaintiff was found guilty and given 45 days of segregation. (Id.) He appealed to Major Byrne, but was still found guilty. (Id.)

On August 16, 2012, Plaintiff had his disciplinary hearing for possession of a weapon. (Id.) Defendant McCall found the weapon, a 1½ inch piece of copper wire, in Plaintiff's property bag. (Doc. 40-1, p. 12). Plaintiff claims that, during the hearing, the hearing officers failed to read the written misbehavior report, refused to provide the misbehavior report witness

list, and refused to record the hearing.  (Doc. 1, pp. 6-7).  (Doc. 1, p. 7).  Plaintiff argued that the officer who filed the report, Defendant McCall, did so to retaliate against him for filing a lawsuit against the officer.  (Id).  He also argued that the wire was not a weapon.  (Id.)  Even so, Plaintiff was found guilty of the charges and given 24 days in segregation.  (Id.)  Plaintiff appealed to Major Byrne, explaining all the due process violations noted above, but Byrne still found Plaintiff guilty.  (Id.)

On August 19, 2012, an appointment was scheduled for Plaintiff with Dr. Charles Sherman, a certified internist with approximately 27 years' experience who provides medical services at the medical clinic located within the Corrections Center.  (Jacoby v. Baldwin County, Civ. A. No. 12-0197-WS-M, 2013 WL: 2285108, * 2 (S.D. Ala. May 22, 2013)(hereinafter Jacoby 1); Doc. 36, p. 9).  The appointment was scheduled after Plaintiff complained of being "unstable mentally," "very emotional," and losing [his] mind," and he stated, "I need psychiatric help please."  (Jacoby 1 at *2).

On August 20, 2012, at pill call, Plaintiff stated he was "refusing all mental health medications."  Id.  Later that morning, Plaintiff obtained a razor blade and started cutting on his throat with it.  (Doc. 1, p. 9).  Plaintiff was taken to medical, his throat was bandaged, and he was put on suicide watch in a restraint chair.  (Id.)  Several hours later, he pulled his hands out of the restraints and began cutting on his throat again with a razor he had swallowed.  (Id.)  He was again taken to medical, treated, and placed on suicide watch in an observation cell.  (Id.)  Early on August 21, 2012, Plaintiff, who claimed to have been off his medications for five days because he was mad, cut his wrist and was observed ramming his head into the bars stating, "I'm tired of this crap.  I need to see mental health.  I need help."  (Id.; Jacoby 1 at *2).  That day, Nurse Wasdin, the nurse at the Baldwin County Correctional Center, petitioned the Probate

Court of Baldwin County for involuntary commitment of Plaintiff detailing his previous incidents of self-harm. (Jacoby 1 at *2).

After being medically treated in the early morning hours of August 21, Plaintiff was put in the restraint chair and remained there until 2:00 p.m. with only one break. (Doc. 1, pp. 9-10). Plaintiff was then put back in the suicide cell with no mattress until August 29, 2012. (Doc. 1, p. 10). Plaintiff was given a mattress, one uniform, and his legal work on August 29 and was still kept on 30 minute observation/suicide watch until September 5, 2012. (Id.)

Baldwin County Mental Health assessed Plaintiff on August 27, 2012 and August 31, 2012 for possible commitment. (Jacoby 1 at *3). It was determined that Plaintiff was generally stable and did not exhibit any acute psychotic symptoms. (Id.) The mental health professional "felt that the behaviors reported [the cutting incidents] in the Petition for Commitment [were] primarily reflective of his personality disorder rather than a serious mental illness. Inpatient commitment [was] not recommended at [that] time. However, it [was] recommended that Mr. Jacoby continue to be closely observed as it [was] possible that he may engage in similar manipulative behaviors in the future." (Id. (emphasis added)).

On October 10, 2012, Plaintiff filed his Prisoner Complaint [For Inmate Action] Under 42 U.S.C. § 1983. (Doc. 1). Based upon the foregoing facts, Plaintiff alleges that Defendants Baldwin County, Alabama, Assistant Chief Deputy of Corrections Dale Byrne, and Baldwin County Sheriff Huey Mack have violated his Fourteenth Amendment rights by having inadequate disciplinary proceeding policies or customs, by having inadequate housing facilities for seriously-severely mentally challenged inmates, and by having inadequate psychiatric care policies. (Doc. 1, pp. 12-15, 19). Plaintiff also alleges that Defendants Byrne and Mack have violated his Fourteenth Amendment rights by providing an unsafe environment and his

Fourteenth, First, and Sixth Amendment rights by unnecessarily depriving him of periodicals, stationary, postage stamps, hygiene products, and recreation in the segregation unit for punitive reasons which served no peneological interests. (Doc. 1, pp. 13-16). He also claims that Byrne has denied him due process rights. (Doc. 1, p. 14). In addition, Plaintiff alleges that Defendant Corporal Wallace McCall violated his constitutional rights by retaliating against him for filing a prior § 1983 complaint, and he alleges that Defendants Officer Bret Morse, Sergeant Calvin Means, and Captain Jimmie Bennett breached a duty to protect Plaintiff. (Doc. 1, pp. 16-18). Finally, Plaintiff has also made a claim against Defendant Means for unnecessary use of excessive force. (Doc. 1, p. 18). Plaintiff seeks injunctive and monetary relief. (Doc. 1, p. 20).

Defendants filed an answer and special report denying Plaintiff's claims and asserting the defenses of absolute immunity, qualified immunity, res judicata, collateral estoppel and failure to comply with the Prison Litigation Reform Act. (Docs. 32, 36). Defendants filed several affidavits in support of their position (Docs. 37-41, 46, 53). On July 18, 2013, the Court filed an order converting Defendants' special report to a motion for summary judgment. (Doc. 43). Rather than filing a response, on August 13, 2013, Plaintiff filed a motion for summary judgment. (Doc. 56). Defendants filed a response in opposition to Plaintiffs' motion and supporting affidavits on September 25, 2013, and Plaintiff filed a reply on October 8, 2013. (Docs. 64, 66). On or about October 17, 2013, Plaintiff was transferred to Kilby Correctional Facility and is now currently incarcerated at Ventress Correctional Facility. (Docs. 67, 69).

II. MOTION FOR SUBSTITUTION OF PARTY

On December 10, 2013, Defendants filed a Suggestion of Death giving notice that Defendant Byrne is now deceased. (Doc. 71). Pursuant to Rule 25, Plaintiff filed a motion to substitute Defendant Major Milton, the successor to Byrne at the Baldwin County Correctional

Center, in place of Byrne on January 10, 2014. (Doc. 72). Plaintiff claims that the policies of which he complains are still being promulgated by Defendant Milton. (Id.) This Court grants Plaintiff's motion to substitute with regard to claims asserted against Defendant Milton in his official capacity as Byrne's successor and his claims for injunctive relief. The Court hereby dismisses all claims asserted against Byrne, if any, in his individual capacity as there is no evidence that Milton had any personal involvement in those claims and therefore cannot he held personally liable.

III.    SUMMARY JUDGMENT STANDARD

In analyzing the propriety of a motion for summary judgment, the Court begins with these basic principles. The Federal Rules of Civil Procedure grant this Court authority under Rule 56 to render "judgment as a matter of law" to a party who moves for summary judgment. Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986), the Supreme Court held that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact. . . ." However, all of the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Jackson v. BellSouth Telecomms., 372 F.3d 1250, 1280 (11th Cir. 2004).

Federal Rule of Civil Procedure 56(e) further provides:

> If a party fails to properly support an assertion of fact or fails to
> properly address another party's assertion of fact as required by Rule
> 56(c), the court may:
> (1) give an opportunity to properly support or address the fact;

(2) consider the fact undisputed for purposes of the motion;
(3) grant summary judgment if the motion and supporting materials--
including the facts considered undisputed--show that the movant is
entitled to it; or
(4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).

The party seeking summary judgment "always bears the initial responsibility of

informing the district court of the basis for its motion, and identifying those portions of the

'pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."

Celotex, 477 U.S. at 323. The movant can meet this burden by presenting evidence showing

there is no dispute of material fact or by pointing out to the district court that the nonmoving

party has failed to present evidence in support of some element of its case on which it bears the

ultimate burden of proof. Id. at 322-25.

Once the moving party has satisfied its responsibility, the burden shifts to the non-movant

to show the existence of a genuine issue of material fact. See Stabler v. Florida Van Lines, Inc.,

Civ. A. No. 11-0103-WS-N, 2012 WL 32660, at *5 (S.D. Ala. Jan. 6, 2012) (citing Clark v.

Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991)). Summary judgment is proper when "a

party fails to make a showing sufficient to establish the existence of an essential element of that

party's case." McDowell v. Brown, 392 F.3d 1283, 1288 (11th Cir. 2004) (citations and internal

quotation marks omitted). "[T]here is no issue for trial unless there is sufficient evidence

favoring the nonmoving party for a jury to return a verdict for that party. . . . If the evidence is

merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (internal citations omitted).

"After the nonmoving party has responded to the motion for summary judgment, the court must

grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." AGSouth Genetics, LLC v. Cunningham, No. CA 09-745-C, 2011 WL 1833016, at *2 (S.D. Ala. May 13, 2011).

IV.  DISCUSSION

In this action, Plaintiff seeks redress for an alleged constitutional deprivation pursuant to 42 U.S.C. § 1983.  Section 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.  For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983 (1994).  Plaintiff seeks monetary damages and injunctive relief.  For the reasons that follow Plaintiff cannot prevail on any of his claims.

A.  **CLAIMS AGAINST BALDWIN COUNTY**

Plaintiff has named Baldwin County, Alabama as a defendant alleging that it has violated his Fourteenth Amendment rights by having inadequate disciplinary proceeding policies or customs, by not separating seriously-severely mentally challenged inmates from other inmates in segregation, and by having inadequate psychiatric care policies at the Baldwin County Correctional Center.  (Doc. 1, pp. 12-15, 19).  Plaintiff's claims against Baldwin County are based on policies or customs allegedly promulgated by the county that violate Plaintiff's constitutional rights.  However, Plaintiff has not produced any such policies nor described how any actions of the county led to any such custom.  Plaintiff seems to be basing his claim against the county merely on the fact the name of the facility is Baldwin County Correctional Facility.  It is well established in Alabama that  "the duties of the counties with respect to the jails 'are

limited to funding the operation of the jail and to providing facilities to house the jail.'" Turquitt v. Jefferson Co., 137 F.3d 1285, 1289 (11th Cir. 1998)(quoting Stark v. Madison County, 678 So. 2d 787, 787 (Ala. Civ. App. 1996)).  These duties have been construed to be limited to erecting the jail and maintaining its physical plant.  Id.  "[N]one of these duties relates to the daily operation of the jails or to the supervision of inmates."  Id. Id. at 1288.  "'[T]he sheriff's authority over the jail is totally independent of the [county].'"  Id. at 1289 (quoting King v. Colbert County, 620 So. 2d 623, 625 (Ala.1993)).  "[A]n Alabama sheriff acts exclusively for the state rather than for the county in operating a county jail."  Id. at 1288.  Therefore, Plaintiff cannot prevail on his claim as to Defendant Baldwin County.

B.    **OFFICIAL CAPACITY CLAIMS**

To the extent Plaintiff is proceeding against the remaining Defendants in their official capacities, those claims fail.  The Eleventh Amendment, which specifically prohibits suits against "the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State," has long been held to apply "equally to suits against a state brought in federal court by citizens of that state."  Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1277 (11th Cir. 1998).  "The state need not be formally named as a defendant for the amendment to apply; state officials sued in their official capacity are also protected by the amendment."  Id. (citing Kentucky v. Graham, 473 U.S. 159, 166-67 (1985)). "Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties."  Will v. Mich. Dep't of State Police, 491 U.S. 58, 66 (1989).

Plaintiff alleges that Defendant Sheriff Mack and the remaining Defendants, all of whom were employed by the Baldwin County Sheriff as corrections officers at the Baldwin County

Correctional Center at the time of the incidents alleged in the complaint, violated his constitutional rights. "[A]n Alabama sheriff acts exclusively for the state rather than for the county in operating a county jail." Turquitt v. Jefferson County, 137 F.3d 1285, 1288 (11th Cir.), cert. denied, 525 U.S. 874 (1998). It is well settled in this circuit that Alabama sheriffs are executive officers of the state and that a suit against a sheriff in his official capacity is the equivalent of a suit against the state. See Free v. Granger, 887 F.2d 1552, 1557 (11th Cir. 1989). "[T]he state is considered the real party in interest because an award of damages would be paid by the state." Carr v. City of Florence, 916 F.2d 1521, 1524 (11th Cir. 1990). Accordingly, suits against Alabama sheriffs in their official capacities are generally barred by the Eleventh Amendment. See Taylor v. Adams, 221 F.3d 1254, 1256 (11th Cir. 2000); Lancaster v. Monroe County, 116 F.3d 1419, 1429 (11th Cir. 1997); Dean v. Barber, 951 F.2d 1210, 1215 n.5 (11th Cir.1992); Free, 887 F.2d at 1557. In Lancaster, this immunity was extended to correctional officers employed by county sheriffs. Lancaster, 116 F.3d at 1429-31.

The Supreme Court has recognized three limited exceptions to the rule barring § 1983 actions against state officials sued in their official capacity. The first exception is when a state has waived its Eleventh Amendment sovereign immunity and has consented to suit in federal court. Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 238 (1985). This exception does not apply here, however, because the State of Alabama has not waived its immunity to suit in § 1983 cases. See Alabama v. Pugh, 438 U.S. 781, 782 (1978). The Alabama Constitution explicitly states that "the State of Alabama shall never be made a defendant in any court of law or equity." Ala. Const. Art. I, § 14. The second exception is when Congress has properly abrogated sovereign immunity through its powers under the Fourteenth Amendment; however, such an abrogation has not occurred with respect to § 1983 claims. Seminole Tribe of Fla. v. Florida,

517 U.S. 44, 55-73 (1996); Carr, 916 F.2d at 1525.  Lastly, under the doctrine of Ex parte Young, the Eleventh Amendment does not bar § 1983 actions against state officials which seek prospective injunctive relief to end continuing violations of federal law.  See Ex parte Young, 209 U.S. 123, 155-56 (1908); see also Seminole Tribe of Fla., 517 U.S. at 73 (quoting Green v. Mansour, 474 U.S. 64, 68 (1985)); Summit Med. Assoc. v. Pryor, 180 F.3d 1326, 1336 (11th Cir. 1999).  As noted in Summit Medical, "[b]ecause of the important interests of federalism and state sovereignty implicated by Ex parte Young ... the doctrine is not without limitations."  180 F.3d at 1337.  One limitation, which is relevant to this action, is that "the Ex parte Young doctrine applies only to ongoing and continuous violations of federal law."  Id. (citing Papasan v. Allain, 478 U.S. 265, 277-78 (1986));  see infra pp. 14-15.  "[A] plaintiff may not use the doctrine to adjudicate the legality of past conduct."  Id.

Applying the foregoing tenets of law to the instant case, it is clear that Plaintiff's claim for monetary relief against Defendants, in their official capacities, is due to be dismissed. Defendant Sheriff Mack is the sheriff of Baldwin County.  The remaining Defendants were all employed by the Baldwin County Correctional Center as employees of the sheriff's department. These Defendants clearly represent the state with regard to their duties concerning the operation of the Baldwin County Correctional Center.  The Court finds that any claim made by Plaintiff against these Defendants in their official capacities concerns duties they were entrusted to perform on behalf of the state; therefore, they are entitled to Eleventh Amendment immunity from Plaintiff's claim for monetary damages.  See, e.g. Lancaster, 116 F.3d at 1429-30 (holding that jailers are state officials entitled to the same Eleventh Amendment immunity as the sheriff because they are responsible to the sheriff for their performance of state-mandated duties.)

Accordingly, Plaintiff's claim for monetary damages against Defendants in their official capacities is due to be dismissed.[1]

###    C.    INJUNCTIVE RELIEF

Plaintiff also seeks an injunction in this case "in regards to the mental health care." (Doc. 1, p. 20) Although this claim is somewhat vague, presumably, Plaintiff wants an injunction requiring Defendants to provide him with exactly the mental health care he desires. That claim is due to be dismissed. Plaintiff's request is barred as moot because Plaintiff is no longer incarcerated at the Baldwin County Correctional Center. He is now incarcerated at Ventress Correctional Facility in Clayton, Alabama. (Doc. 69). There is no evidence that Plaintiff will be returning to the Baldwin County Correctional Center. In Spears v. Thigpen, 846 F.2d 1327, 1328 (11th Cir. 1988), the court held that a prisoner's claim for injunctive relief relating to conditions at a particular facility becomes moot when the prisoner is transferred to another facility because a case or controversy no longer exists. Moreover, there is no evidence of "any continuing, present injury or real and immediate threat of repeated injury" to Plaintiff from these Defendants. See Cotteral v. Paul, 755 F.2d 777, 780 (11th Cir. 1985); Dudley v. Stewart, 724 F.2d 1493, 1494 (11th Cir. 1984).

To the extent Plaintiff seeks an injunction on behalf of other unnamed inmates currently incarcerated in the Baldwin County Correctional Center, his claim also fails. Plaintiff's attempt to procure injunctive relief on behalf of unnamed inmates is an impermissible attempt to assert third party rights in federal court. The standing doctrine frowns upon Plaintiff's attempt to assert rights for others outside the context of a class action lawsuit. Generally, "a litigant must assert

---

[1] By definition, only "persons" may be sued for a constitutional deprivation under § 1983. 42 U.S.C. § 1983 (1994). In Will, 491 U.S. at 71, the Court held that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983" with regard to claims for damages. Therefore, Defendants, in their official capacities, are not subject to suit for monetary damages under § 1983 for this reason as well.

his own legal rights and interests and may not ordinarily rely on the rights and interests of third parties." Harris v. Evans, 20 F.3d 1118, 1121 (11th Cir.), cert. denied, 513 U.S. 1045 (1994). "The prohibition against third-party standing promotes the fundamental purpose of the standing requirement by ensuring that the courts hear only concrete disputes between interested litigants who will frame the issues properly." Id. (citing Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 220-21 (1974)). Inmates presently housed at the Baldwin County Correctional Center can assert their own constitutional rights should they choose to do so. See Harris, 20 F.3d at 1124.

Accordingly, Plaintiff's claim for injunctive relief against Defendants is due to be dismissed.

### D. INDIVIDUAL CAPACITY CLAIMS ARISING FROM THE INCIDENTS OF AUGUST 20 AND 21, 2012

On March 19, 2012, Plaintiff filed a § 1983 case in this Court against several of the same defendants included in the instant case. As amended, that case involved many of the exact claims made in the instant case, specifically those arising out of the incidents that occurred on August 20 and 21, 2012, as well as the treatment of Plaintiff subsequent to those incidents. See Jacoby v. Baldwin County ("Jacoby 1"), Civ. A. No. 12-0197-WS-M, 2013 WL 2285108 (S.D. Ala. May 22, 2013). Defendants Major Byrne and Sheriff Mack were named as defendants in both cases.[2] In addition, Plaintiff asserted many of the same claims in both cases, namely he alleged in both cases (1) that Defendants Byrne and Mack did not provide adequate psychiatric care to him and did not have adequate psychiatric care policies and (2) that Defendants Byrne and Mack did not maintain a safe suicide watch environment. Both of those claims were decided adversely to Plaintiff (Jacoby 1 at *11-12); therefore, he is barred from relitigating those claims

---

[2] The fact that Major Milton had now been substituted for Major Byrne makes no difference because Milton was clearly in privity with Byrne for purposes of this discussion.

in this action.  See Griswold v. County of Hillsborough, 598 F.3d 1289, 1292 (11th Cir. 2010) (holding that [u]nder the doctrine of res judicata, a claim is barred by prior litigation if: '(1) there is a final judgment on the merits; (2) the decision was rendered by a court of competent jurisdiction; (3) the parties, or those in privity with them, are identical in both suits; and (4) the same cause of action is involved in both cases.'" (citation omitted)).

Although not specifically made as a claim in Jacoby 1, Plaintiff's claim that Defendants Byrne and Mack breached his constitutional rights by not having and not placing him in a separate facility for seriously-severely mentally ill inmates could have been raised by Plaintiff in Jacoby 1 ; therefore, that claim is also barred.  See Polk v. Sears, Roebuck, and Co., Civ. A. No. 11-0725-WS-B. 2012 WL 1640708, *5 (S.D. Ala. May 8, 2012).   In addition, the court in Jacoby 1 found that the environment in which he was kept was not unconstitutionally unsafe. Jacoby 1 at *11-12.  Moreover, there is no evidence that Plaintiff is severely or seriously mentally ill.  In fact, he was evaluated by Baldwin County Mental Health for possible commitment, and the mental health professional found that he was not suffering from a serious mental illness.  Jacoby 1 at *3.  Accordingly, he has no standing to bring such a claim.  Harris, 20 F.3d at 1121.

### E.    INDIVIDUAL CAPACITY CLAIMS

Plaintiff has asserted the following individual capacity claims:  (1) claim against Sheriff Mack for inadequate disciplinary proceedings, policies, and customs, (2) claim against Sheriff Mack for unnecessary deprivation of periodicals, stationary, postage stamps, hygiene products, and recreation in the segregation unit, (3) claim against Corporal McCall for retaliatory treatment, (4) claims against Officer Morse, Sergeant Means, and Captain Bennett for breaching a duty to protect him on or about August 20, 2012 when he was on suicide watch, and (5) claim

against Sergeant Means for unnecessary use of excessive force.   These Defendants have denied that they violated any of Plaintiff's constitutional rights and have asserted the defense of qualified immunity.

Qualified immunity protects government actors from liability, when performing discretionary functions, to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  In Lassiter v. Alabama A&M University, 28 F.3d 1146 (11th Cir. 1994), the Eleventh Circuit restated the principles governing qualified immunity cases:

> That qualified immunity protects government actors is the usual rule; **only in exceptional cases will government actors have no shield against claims made against them in their individual capacities**. ... Unless a government agent's act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit.

28 F.3d at 1149 (internal footnote and citations omitted) (bold added).

**1. Discretionary Authority**

The defendant has the initial burden of proving that he acted within the scope of his discretionary authority.  Jordan v. Doe, 38 F.3d 1559, 1565 (11th Cir. 1994).  To determine whether a defendant acted within the scope of his discretionary authority, the court must consider whether the actions of which the plaintiff complains "(1) 'were undertaken pursuant to the performance of his duties,' and (2) were 'within the scope of his authority.'" Id. at 1566 (quoting Rich v. Dollar, 841 F.2d 1558, 1564 (11th Cir. 1988)).  Thus, the term "discretionary authority" in this context includes actions that not only entail an element of discretion but also those actions that are more ministerial in nature. See id.  Accordingly, discretionary authority will generally be found if the defendant is working within the confines of his or her job.

In this case, Plaintiff does not contest that Defendants were acting within the scope of their discretionary authority. Each of the claims asserted against Defendants in this case is clearly related to each of the Defendants responsibilities with regard to their jobs. Their alleged actions, or failure to act, in this case were, accordingly, within the scope of their discretionary authority.

## 2. <u>Violation of Constitutional Right</u>

Because Defendants have met the burden of proving that they acted within the scope of their discretionary authority, Plaintiff now has the burden of proving that the actions of Defendants violated clearly established constitutional rights of which a reasonable person would have known. <u>See</u> <u>Harlow</u>, 457 U.S. at 818; <u>Lassiter</u>, 28 F.3d at 1150 n.3. As explained by the Supreme Court in <u>Saucier v. Katz</u>, 533 U.S. 194 (2001), the "threshold question" to determine whether Defendants are entitled to qualified immunity is as follows: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [defendants'] conduct violated a constitutional right?" <u>Saucier</u>, 533 U.S. at 201; <u>see also</u> <u>Siegert v. Gilley</u>, 500 U.S. 226, 232 (1991) ("A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all"). While the Supreme Court in <u>Pearson v. Callahan</u>, 555 U.S. 223, 236 (2009), found that the <u>Saucier</u> procedure is discretionary, rather than mandatory, the Court finds application of the procedure beneficial in this case.

In <u>DeShaney v. Winnebago County Department of Social Services</u>, 489 U.S. 189 (1989), the Supreme Court reiterated a state's constitutional responsibilities with regard to inmates:

> [W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a

corresponding duty to assume some responsibility for his safety and general well-being. ... The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs -- e.g., food, clothing, shelter, medical care, and reasonable safety -- it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

489 U.S. at 199-200 (citations omitted). The Eighth Amendment provides that, "[e]xcessive bail shall be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. The Eighth Amendment proscription of cruel and unusual punishment prohibits prison officials from exhibiting deliberate indifference to a substantial risk of serious harm to an inmate. Farmer v. Brennan, 511 U.S. 825, 832-34 (1994). Likewise, the Due Process Clause of the Fourteenth Amendment prohibits prison officials from exhibiting deliberate indifference to a substantial risk of serious harm to a pretrial detainee. See Hale v. Tallapoosa County, 50 F.3d 1579, 1582 n.4 (11th Cir. 1995); Hamm v. DeKalb County, 774 F.2d 1567, 1574 (11th Cir. 1985).

In order to prevail on an Eighth Amendment claim, an inmate must make both an objective and a subjective showing. In Sims v. Mashburn, 25 F.3d 980 (11th Cir. 1994), the court delineated the objective and subjective portions of an Eighth Amendment claim as follows:

An Eighth Amendment claim is said to have two components, an objective component, which inquires whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and a subjective component, which inquires whether the officials acted with a sufficiently culpable state of mind.

25 F.3d at 983. To prevail on constitutional claims like the ones asserted by Plaintiff, a pretrial detainee must prove that there was "a substantial risk of serious harm," that the defendants were

subjectively deliberately indifferent to that risk, and causation.  Hale, 50 F.3d at 1582; see also Farmer, 511 U.S. at 832-34.

The objective component of an Eighth Amendment claim inquires whether the alleged wrongdoing amounted to the infliction of "unnecessary pain or suffering upon the prisoner." LaMarca v. Turner, 995 F.2d 1526, 1535 (11th Cir. 1993).  This standard requires that the alleged deprivation be "objectively, 'sufficiently serious.'"  Farmer, 511 U.S. at 834 (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)).  The objective standard "embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency …, but must be balanced against competing penological goals."  LaMarca, 995 F.2d at 1535 (quoting Estelle v. Gamble, 429 U.S. 97, 102 (1976) (internal quotation marks omitted)).

The subjective component of an Eighth Amendment claim generally "inquires whether the officials acted with a sufficiently culpable state of mind."  Sims, 25 F.3d at 983-84 (citing Hudson v. McMillian, 503 U.S. 1, 8 (1992)).  This component "follows from the principle that 'only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.'" Farmer, 511 U.S. at 834 (quotation and citation omitted).  In prison conditions cases, the required state of mind for a defendant is "deliberate indifference" to an inmate's health or safety.  Id. (citations omitted).  In defining "deliberate indifference," the Supreme Court in Farmer stated:

> We hold … that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Farmer, 511 U.S. at 837.  The Court concluded that the "subjective recklessness" standard of criminal law is the test for "deliberate indifference" under the Eighth Amendment.  Id. at 839-40.

There is no liability for "an official's failure to alleviate a significant risk that he should have perceived but did not … ." Farmer, 511 U.S. at 838. It is not enough that an inmate proves that the defendant should have known of the risk, but did not, as actual knowledge is the key. See, e.g., Cottrell v. Caldwell, 85 F.3d 1480, 1491 (11th Cir. 1996). A prison official's duty under the Eighth Amendment is to ensure "reasonable safety," "a standard that incorporates due regard for prison officials' 'unenviable task of keeping dangerous men in safe custody under humane conditions.'" Farmer, 511 U.S. at 844-45 (citations omitted). "[A] prison custodian is not the guarantor of a prisoner's safety." Purcell ex rel. Morgan v. Toombs Cnty., 400 F.3d 1313, 1321 (11th Cir. 2005) (citation omitted). A prison official's duty under the Eighth Amendment is to ensure "reasonable safety" under the conditions inherent in a jail setting. See Farmer, 511 U.S. at 844-45.

### a. Disciplinary Proceedings Claim

Plaintiff alleges that Sheriff Mack violated his constitutional rights by having in place at the Baldwin County Correctional Center a policy and/or custom that allowed officers who had witnessed incidents to sit on the three person hearing board, that did not allow recording of the hearings, and that did not allow for copies of the narrative written misbehavior report to be provided to inmates. Plaintiff cannot prevail on this claim because these alleged inadequacies simply do not give rise to a constitutionally protected liberty interest. See Sandin v. Conner, 515 U.S. 472, 485-86 (1995); Hall v. Holt, Civ. A. No. 92-0013-RV-M, 1995 U.S. Dist. LEXIS 20346, at * 135 (S.D. Ala. June 12, 1995)(quoting Buckley v. Barlow, 997 F.2d 494, 495 (8th Cir. 1993)). "Admittedly, prisoners do not shed all constitutional rights at the prison gate, …, but '[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'"

Sandin, 515 U.S. at 485 (citations omitted). The Supreme Court has held that temporary disciplinary segregation is not a "dramatic departure" from the ordinary conditions of confinement for an inmate so as to invoke the due process procedures provided at a criminal trial, for example. Id. (finding that an inmate's discipline in segregated confinement did not present the type of atypical , significant deprivation in which a State might conceivably create a liberty interest); see also Rodgers v. Singletary, 142 F.3d 1252, 1253 (11th Cir. 1998)(affirming that two months in administrative segregation was not a constitutionally protected liberty interest requiring the protection of due process).

On August 15, 2012, Plaintiff had a disciplinary hearing for failing a urine test for drugs. (Doc. 1, p. 6). Plaintiff was found guilty and given 45 days of segregation. (Id.) He appealed to Major Byrne, but was still found guilty. (Id.) On August 16, 2012, Plaintiff had his disciplinary hearing for possession of a weapon. (Id.) Plaintiff was found guilty of the charges and given 24 days in segregation. (Id.) Plaintiff appealed to Major Byrne, explaining all the due process violations noted above, but Byrne still found Plaintiff guilty. (Id.) These two brief sentences in segregation do not amount to a significant hardship and are not a dramatic departure from the ordinary conditions of confinement. Therefore, this Court finds that no liberty interests existed that would give rise to constitutional due process protection in this case and that this claim is due to be dismissed.

**b. Deprivation of Periodicals, Stationary, Etc.**

Plaintiff claims that Sheriff Mack created unconstitutional policies that unnecessarily deprived him of periodicals, stationary, postage stamps, hygiene products, and outdoor recreation while he was housed in the segregation unit. The Inmate Handbook provides that inmates placed in disciplinary segregation lose all day room privileges, visitation, recreation, and commissary

use and are only allowed the Bible or Koran as reading material. (Doc. 41-1, p. 12). Inmates on

suicide watch are provided an anti-suicide gown and given a sleeping mat. (Doc. 53-1, p. 5).

These inmates may not normally possess bedding materials, clothing, or personal property due to

the risk that these items could be used for self-injury. (Id.)

The issue presented here is whether Sheriff Mack's institution of these policies violated

clearly established constitutional rights of which a reasonable person would have known. "The

'cruel and unusual punishments' standard [of the Eighth Amendment] applies to the conditions

of a prisoner's confinement." Chandler v. Crosby, 379 F.3d 1278, 1288 (11th Cir. 2004) (citing

Rhodes v. Chapman, 452 U.S. 337, 345-46 (1981)).[3] As noted above, in DeShaney, 489 U.S. at

199-200, the United States Supreme Court stated that if a state "fails to provide for [an

incarcerated person's] basic human needs -- e.g., food, clothing, shelter, medical care, and

reasonable safety -- it transgresses the substantive limits on state action set by the Eighth

Amendment and the Due Process Clause." The Eighth Amendment, however, "does not

authorize judicial reconsideration of 'every governmental action affecting the interests or well-

being of a prisoner.'" Campbell v. Sikes, 169 F.3d 1353, 1362 (11th Cir. 1999) (quoting Whitley

v. Albers, 475 U.S. 312, 319 (1988)). Furthermore, "the Constitution does not mandate

comfortable prisons." Rhodes, 452 U.S. at 349. The Eighth Amendment proscribes those prison

conditions which "shock[] the conscience," involve the "wanton and unnecessary infliction of

---

[3] Because Plaintiff was a pretrial detainee at the time the acts giving rise to this claim occurred, his claim alleging cruel and unusual punishment sounds properly in the Fourteenth Amendment right to due process rather than in the Eight Amendment. See Taylor v. Adams, 221 F.3d 1254, 1257 n.3 (11th Cir. 2000); Lancaster v. Monroe County, 116 F.3d 1419, 1425 n.6 (11th Cir. 1997); Hale v. Tallapoosa County, 50 F.3d 1579, 1582 n.4 (11th Cir. 1995); Hamm v. DeKalb County, 774 F.2d 1567, 1572 (11th Cir. 1985). Nevertheless, his claim is analyzed the same regardless of whether it arises under the Due Process Clause of the Fourteenth Amendment or under the Eighth Amendment. Id. Accordingly, the Court can rely upon both Eighth Amendment and Fourteenth Amendment cases in ruling upon Defendants' Motion for Summary Judgment. Id.

pain," or which are "grossly disproportionate to the severity of the crime warranting imprisonment." Id. at 347; Shely v. Dugger, 833 F.2d 1420, 1429 (11th Cir. 1987).

In order to prevail on a conditions of confinement claim, an inmate must make both an objective and a subjective showing. First, the inmate must prove that the conditions of confinement were, "objectively, 'sufficiently serious'" so as to amount to the denial of a basic human need. Chandler, 379 F.3d at 1289 (quoting Hudson v. McMillian, 503 U.S. 1, 8 (1992)). A prisoner must prove the denial of "the minimal civilized measure of life's necessities." Chandler, 379 F.3d at 1289-90 (quoting Hudson, 503 U.S. at 9). The challenged condition must be "extreme." Id. Although an inmate "need not await a tragic event" before seeking relief, Helling v. McKinney, 509 U.S. 25, 33 (1993), he must at the very least show that a condition of his confinement pose[s] "an unreasonable risk of serious damage to his future health" or safety. Id. at 35. Moreover, "the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." Id. at 36.

Second, the inmate must prove that the prison official was subjectively "deliberately indifferent" to a substantial risk of harm. Farmer, 511 U.S. at 828-29. "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. In addition, prison officials are not liable even if they actually knew of a risk if they responded reasonably to the risk. Id. at 844. "[A] plaintiff must also show that the constitutional violation caused his injuries." Marsh v. Butler County, Ala., 268 F. 3d 1014, 1028 (11th Cir. 2001) (en banc) (alteration in original).

Having set forth the general legal principles applicable to Plaintiff's claim, the Court now turns to the facts. In his complaint, Plaintiff alleges that he was unnecessarily deprived of periodicals, stationary, postage stamps, hygiene products, and outdoor recreation while he was housed in the segregation unit. The only injuries Plaintiff has complained of as a result of these deprivations is a foot rash and having to put legal work on the back burner. "It is clear that administrative segregation and solitary confinement do not, in and of themselves, constitute cruel and unusual punishment." Shely, 833 F.2d at 1429. Simply stated, Plaintiff's allegations related to his treatment at the Baldwin County Correctional Center do not amount to the denial of a basic human need, see DeShaney, 489 U.S. at 199-200, nor do they evidence a deliberate indifference to a substantial risk of serious harm to plaintiff's health or safety. See Farmer, 511 U.S. at 837-38. Plaintiff's alleged foot rash certainly did not "involve the wanton and unnecessary infliction of pain." Rhodes, 452 U.S. at 347. Even if having to put legal work on the back burner could be considered an injury, in this case it obviously did not injure Plaintiff. As the Court noted above, he was able to file and maintain four separate actions in this Court, filing hundreds of pages of motions and briefs, during the relatively brief time he spent in the Baldwin County Correctional Center. Considering the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff's allegations relating to his confinement in disciplinary segregation fail to establish a constitutional violation.

Plaintiff has failed to set forth sufficient allegations of any constitutional violation committed by Sheriff Mack; therefore, Plaintiff cannot defeat Defendant Mack's qualified immunity defense. The Court concludes that Defendant Mack is entitled to qualified immunity from any claims asserted against him by Plaintiff relating to deprivation of periodicals,

stationary, postage stamps, hygiene products, and outdoor recreation while he was housed in the segregation unit.

### c. __Failure to Protect Claim__

Plaintiff claims that Defendants Morse, Means, and Bennett breached a duty to protect him. Specifically, Plaintiff claims that, on August 20, 2012, he gave Morse a note stating he was going to get a razor and hurt himself if he did not see Major Byrne. (Doc. 1, p. 17). He claims that Morse failed to watch him and have him put in a suicide cell. (Id.) He also claims that Morse failed to adequately check Plaintiff for weapons before putting him in the restraint chair after he cut himself the first time and failed to properly check the restraints. (Id.) Plaintiff claims that, on August 20, 2012, Defendant Means was given a note by Morse that said Plaintiff was going to get a razor and kill himself and that Means gave the note to Defendant Bennett, but did not put Plaintiff on suicide watch. (Id.) Plaintiff also claims that, on August 20, 2012, Bennett received a note saying that Plaintiff wanted to see Byrne or he would get a razor and kill himself, but he did not put Plaintiff on suicide watch. (Id. at p. 18). Plaintiff alleges that because he was not put on suicide watch, he ended up hurting himself. (Id. at pp. 17-18). As discussed supra at pp. 5-6, Plaintiff did cut himself with a razor three times within a 24-hour period on August 20 and 21, 2012, but sustained only superficial wounds which only required bandaging.

Having set forth the general legal principles applicable to Plaintiff's claim, see supra pp. 18-21, this Court must now determine whether Plaintiff has alleged facts which, when "[t]aken in the light most favorable to [him]," defeat Defendants' qualified immunity defense. To defeat Defendants' qualified immunity defense, Plaintiff must have sufficiently alleged that he was at substantial risk of serious harm and that Defendants were subjectively deliberately indifferent to that risk. With regard to Plaintiff's claims against Defendants Means and Bennett,

his allegations are mere speculation. He offers no evidence that he saw either Means or Bennett receive any alleged note. Defendants Means and Bennett testified by affidavit that they did not receive such a note regarding Plaintiff. (Doc. 36-5, p.2; Doc. 36-1, p. 2). Mere conclusory allegations, "in the absence of supporting evidence, are insufficient to withstand summary judgment." Holifield v. Reno, 115 F.3d 1555, 1564 n. 6 (11th Cir. 1997). These vague, speculative, and conclusory allegations do not support a finding that Defendants Means and Bennett were deliberately indifferent to any substantial risk of serious harm to Plaintiff.

As discussed above, the Due Process Clause of the Fourteenth Amendment prohibits prison officials from exhibiting deliberate indifference to a substantial risk of serious harm to a pretrial detainee. See Hale, 50 F.3d at 1582 n.4; Hamm, 774 F.2d at 1574. In order to prevail on such a claim, an inmate must make both an objective and a subjective showing. To sustain a claim against Defendant Morse, Plaintiff must show that his alleged wrongdoing was objectively harmful enough to establish a constitutional violation, that he was subjectively deliberately indifferent to that risk, and causation. Hale, 50 F.3d at 1582; Sims, 25 F.3d at 983; see also Farmer, 511 U.S. at 832-34.

The objective component of an Eighth Amendment claim inquires whether the alleged wrongdoing amounted to the infliction of "unnecessary pain or suffering upon the prisoner." LaMarca v. Turner, 995 F.2d 1526, 1535 (11th Cir. 1993). This standard requires that the alleged deprivation be "objectively, 'sufficiently serious.'" Farmer, 511 U.S. at 834 (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)). The objective standard "embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency …, but must be balanced against competing penological goals." LaMarca, 995 F.2d at 1535 (quoting Estelle v. Gamble, 429 U.S. 97, 102 (1976) (internal quotation marks omitted)).

The subjective component of an Eighth Amendment claim generally "inquires whether the officials acted with a sufficiently culpable state of mind." Sims, 25 F.3d at 983-84 (citing Hudson v. McMillian, 503 U.S. 1, 8 (1992)). This component "follows from the principle that 'only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.'" Farmer, 511 U.S. at 834 (quotation and citation omitted). In prison conditions cases, the required state of mind for a defendant is "deliberate indifference" to an inmate's health or safety. Id. (citations omitted). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. The Court concluded that the "subjective recklessness" standard of criminal law is the test for "deliberate indifference" under the Eighth Amendment. Id. at 839-40.

There is no liability for "an official's failure to alleviate a significant risk that he should have perceived but did not … ." Farmer, 511 U.S. at 838. It is not enough that an inmate proves that the defendant should have known of the risk, but did not, as actual knowledge is the key. See, e.g., Cottrell v. Caldwell, 85 F.3d 1480, 1491 (11th Cir. 1996). A prison official's duty under the Eighth Amendment is to ensure "reasonable safety," "a standard that incorporates due regard for prison officials' 'unenviable task of keeping dangerous men in safe custody under humane conditions.'" Farmer, 511 U.S. at 844-45 (citations omitted). "[A] prison custodian is not the guarantor of a prisoner's safety." Purcell ex rel. Morgan v. Toombs Cnty., 400 F.3d 1313, 1321 (11th Cir. 2005) (citation omitted). A prison official's duty under the Eighth Amendment is to ensure "reasonable safety" under the conditions inherent in a jail setting. See Farmer, 511 U.S. at 844-45.

To prevail on his claim against Defendant Morse, Plaintiff must allege sufficient facts to show that Defendant Morse knew of an excessive risk to Plaintiff and deliberately disregarded

the risk. <u>Farmer</u>, 511 U.S. at 837. Plaintiff claims that he gave Morse a suicide note at approximately 8:15 a.m. on August 20, 2012. (Doc. 1, pp. 8-9). In his affidavit, Morse testified that on the morning of August 20, 2012, at 8:20 a.m., Plaintiff refused to lock down so a code yellow was called, other correctional officers came, and Plaintiff was put directly into his cell in segregation. (Doc. 36-6, p. 2). He does not recall receiving a note from Plaintiff. (<u>Id</u>.) At approximately 9:30 a.m., Plaintiff obtained a razor from another prisoner and began cutting his throat. (Doc. 1, p. 9). He then swallowed the razor. (Doc. 56, p. 20). Corporal Pettway saw Plaintiff screaming at his door with blood running down his neck and took him for medical treatment. (Doc. 36-6, p. 3). After he was treated, Plaintiff was confined in a restraint chair at approximately 11:02 a.m. and began yelling, cursing and threatening to hand out razors to all inmates. (<u>Id</u>.) At approximately 12:07 p.m., he calmed down and ate his lunch. (<u>Id</u>.) In order to allow an inmate to eat while in the restraint chair, officers place the tray on their lap and undo one strap. (<u>Id</u>.) On August 20, 2012, the Baldwin County Correctional Center used restraint chairs with cloth restraints that had to be tightened to the right point so that they were loose enough for relative comfort, but tight enough to restrain the inmate. (<u>Id</u>.) The restraints were normally checked every hour. (<u>Id</u>.) Morse remembers checking them after lunch because Means called to ask him whether he had done that. (<u>Id</u>.) Morse had no knowledge of inmates being able to free themselves from the restraints and he was unaware of any previous incidents in which Plaintiff had been able to do so. (<u>Id</u>.) Nevertheless, Plaintiff coughed up the razor he had swallowed and managed to work his arms free. (Doc. 56, p. 21). When Morse looked up, he saw him cutting his neck. (Doc. 36-6 at 4). Plaintiff then stood up, grabbed the chair, and threw it down the hallway. (<u>Id</u>.) He was then taken for medical treatment of his superficial wounds. (<u>Id</u>.; <u>Jacoby 1</u> at *2).

In the context of a potentially suicidal inmate, there is no deliberate indifference "unless there was a 'strong likelihood, rather than a mere possibility, that suicide would result from a defendant's action or inaction.'" Heggs v. Grant, 73 F.3d 317, 320 (11th Cir. 1996)(emphasis added). Defendant Morse is therefore entitled to qualified immunity "unless a reasonable officer in his position should have known under the circumstances then existing that [Plaintiff] would most likely harm [himself] if he did not take additional precautions to protect [him]." Heggs, 73 F.3d at 320. "That is 'the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in [Morse's] place that what he [did or did not do] violate[d] federal law.'" Id. at 320-21 (quoting Lassiter v. Alabama A&M Univ. Bd. of Trustees, 28 F.3d 1146, 1149 (11th Cir. 1994)).

In this case, Plaintiff alleges that he gave Morse a note at 8:15 a.m. that said he would cut himself with a razor if he did not get to see Byrne. Even though Morse does not recall receiving a note, for purposes of summary judgment, this Court must view the evidence in the light most favorable to Plaintiff. At this time, as discussed above, Plaintiff was in disciplinary segregation where he admittedly was not allowed certain hygiene items, including specifically razors. There is no evidence that Morse knew that Plaintiff had or had access to a razor. In addition, Plaintiff was well known to be a difficult and manipulative inmate. (Doc. 46-1, pp. 2-3). Under these circumstances, the Court cannot conclude that there was a "strong likelihood" that Plaintiff would attempt suicide if Morse did not immediately summon Byrne. In addition, the Court finds that there was no clearly established law that would provide notice to Morse that his inaction under the circumstances would violate the constitutional rights of Plaintiff.

Plaintiff also claims that Morse violated his constitutional rights by not adequately checking him for weapons when he returned from getting medical treatment and for not adequately tightening

the restraints on the restraint chair. The Court concludes that Plaintiff cannot prevail on this claim either. First, there is no evidence that Morse was the officer who was responsible for checking Plaintiff for weapons. Second, it would have been reasonable for Morse to assume that Plaintiff had been checked for razors when he was taken to medical. Finally, there is no evidence as to how Morse did check Plaintiff. Even if Morse had conducted a thorough search of Plaintiff's person, he could not have found the razor since Plaintiff admittedly swallowed it. (Doc. 56, p. 20). There is no evidence that Morse deliberately failed to adequately tighten Plaintiff's restraints. Morse testified that he was not aware of any inmate and specifically not aware of Plaintiff being able to get out of the restraints on the restraint chair. Moreover, it is obvious that Plaintiff was not actually attempting suicide on this alleged attempt because he cut himself superficially, then picked up the chair and threw it down the hallway. Under the totality of the circumstances, this Court cannot find that Morse <u>knew</u> of an excessive risk to Plaintiff and deliberately <u>disregarded</u> the risk. <u>Farmer</u>, 511 U.S. at 837.

**d. <u>Unnecessary Use of Excessive Force</u>**

Plaintiff claims that Defendant Means used excessive force on Plaintiff when he kept him in the restraint chair on August 21, 2012 for 14 hours which caused him to urinate on himself. To establish a constitutional violation for excessive use of force, Plaintiff must first show that the alleged wrongdoing was objectively "harmful enough" to establish a constitutional violation, meaning Defendant's conduct "shocks the conscience," <u>Lumley v. City of Dade City, Fla.</u>, 327 F.3d 1186, 1196 (11th Cir. 2003), and, second, Plaintiff must show that "the officials act[ed] with a sufficiently culpable state of mind," i.e., that they acted "maliciously and sadistically to cause harm." <u>Hudson v. McMillian</u>, 503 U.S. 1, 6-8 (1992). Under the Eighth Amendment, force is deemed legitimate in a custodial setting as long as it is applied 'in a good faith effort to maintain

or restore discipline [and not] maliciously and sadistically to cause harm.'" Skrtich v. Thornton, 280 F.2d 1295, 1300 (11th Cir. 2002)(quoting Whitley v. Albers, 475 U.S. 312, 320-21 (1986)).

In the prison security context, the factors used to determine whether there has been a violation of the Eighth Amendment are: the need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived, any efforts to temper the severity of a forceful response, and the extent of injury suffered. Hudson, 503 U.S. at 7 (citing Whitley, 475 U.S. at 321). The courts recognize that corrections officials often must make decisions "'in haste, under pressure, and frequently without the luxury of a second chance.'" Id. at 6 (citing Whitley, 475 U.S. at 320). Therefore, "'the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" Id. (citations omitted).

In the instant case, it is apparent that there was a need to restrain Plaintiff based on the fact that he had managed to obtain a razor and cut himself three times within a 24-hour period. Plaintiff does not claim that excessive force was used to get him into the restraint chair. He complains only of the length of time he was placed in the chair, which was from shortly after midnight until 2:00 p.m. The only injury of which he complains is the fact that he urinated on himself. This Court recognizes the difficult position in which the jailers were placed in balancing the need to protect Plaintiff from injuring himself and not restraining him for a period that went beyond that protection. Plaintiff claims that he should have been released earlier because he was not harming himself anymore. However, "[t]he Constitution does not require prison officials to release from restraint a dangerous inmate who has lashed out … simply

because he has stopped lashing out for the time being." <u>Scroggins v. Davis</u>, 346 F. App'x 504, 506 (11th Cir. 2009).

   Under the circumstances of this case, the Court concludes that Defendant Means was justified in the continued use of the restraints.  There is no evidence that Plaintiff was kept in the restraint chair for malicious or sadistic purposes, but rather was kept there in a good faith effort to restore order and protect Plaintiff.  "How long restraint may be continued calls for the exercise of good judgment on the part of prison officials."  <u>Williams v. Burton</u>, 943 F.2d 1572, 1576 (11th Cir. 1991).  "Once it is established that the force was applied in a good faith effort to maintain discipline and not maliciously or sadistically for the purpose of causing harm, the courts give great deference to the actions of prison officials in applying prophylactic or preventive measures."  <u>Id</u>.  "[F]ederal courts must defer in many matters to the expert judgment of these administrators, particularly in matters of internal security and order."  <u>Id</u>. Therefore, the Court finds that Defendant Means is entitled to qualified immunity and summary judgment in his favor based on Plaintiff's claim that continued restraint was excessive force.  <u>See</u> <u>Stanfill v. Talton</u>, 851 F. Supp. 2d 1346, 1373-75 (M.D. Ga. 2012)(holding that defendant was entitled to qualified immunity in case alleging that continued use of restraints on a pretrial detainee who had cut himself and had history of such acts went beyond any reasonable need for such measures).

### e.  <u>Retaliation Claim</u>

   Plaintiff claims that Defendant McCall made a disciplinary report against him in retaliation for Plaintiff filing a lawsuit against Defendant McCall.  (Doc. 1, p. 16).  Plaintiff filed a § 1983 suit that included a claim against McCall on March 19, 2012, alleging that McCall, who at the time was a classification officer, should not have been allowed to determine the length of time he

had to stay on suicide watch because he is not a psychiatrist.  Jacoby 1 at *9.  On August 13, 2012, McCall searched Plaintiff's property bag after Plaintiff was placed in disciplinary segregation.  (Doc. 36-4, pp. 2-3).  After finding a piece of copper wire hidden in Plaintiff's belongings, McCall filed a disciplinary report against him.  (Id. at p. 3).  After a disciplinary hearing, Plaintiff was found guilty of possessing a weapon.  (Doc. 40-1, p. 13).  Plaintiff has admitted that he had the wire, which he alleges came from a television cable that he had to repair, but he disputes that it could be used as a weapon.  (Doc. 1, p. 7).  Defendant McCall denies that he filed the disciplinary charge against Plaintiff in retaliation for Plaintiff filing a complaint against him, noting that it is an accepted part of the job of a corrections officer that inmates sue or threaten to sue correctional officers.  (Doc. 36-4, p. 3).

"The First Amendment protects inmates from retaliation by prison officials for filing lawsuits or administrative grievances." Redd v. Conway, 160 F. App'x 858, 862 (11th Cir. 2005) (citing Wright v. Newsome, 795 F.2d 964, 968 (11th Cir. 1986); Mitchell v. Farcass, 112 F.3d 1483, 1490 (11th Cir. 1997)).  "To state a [F]irst [A]mendment claim for retaliation, a prisoner need not allege violation of a separate and distinct constitutional right."  Thomas v. Evans, 880 F.2d 1235, 1242 (11th Cir. 1989).  Rather, "[t]he gist of a retaliation claim is that a prisoner is penalized for exercising the right of free speech ." Id.  "To state a retaliation claim cognizable under § 1983, a prisoner must demonstrate that (i) he engaged in a constitutionally protected activity, (ii) he suffered adverse treatment simultaneously with or subsequent to such activity, and (iii) a causal connection existed between the protected activity and the adverse action." Flynn v. Scott, 2:04-CV-239-DRB, 2006 WL 1236718, *5 (M.D. Ala. 2006) (citing Donnellon v. Fruehauf Corp., 794 F.2d 598, 600-01 (11th Cir. 1986); Farrow v. West, 320 F.3d 1235, 1248 (11th Cir. 2003)).

"An inmate has the initial burden of establishing a prima facie case of unlawful retaliation by a preponderance of the evidence, which once established raises a presumption that prison officials retaliated against the inmate." Flynn, 2006 WL 1236718, at *5. "Merely alleging the ultimate fact of retaliation, however, is insufficient." Id. Likewise, conclusory allegations will not suffice to demonstrate the existence of each required element. Id. "If an inmate establishes a prima facie case, the burden then shifts to prison officials to rebut the presumption by producing sufficient evidence to raise a genuine issue of fact as to whether the prison official retaliated against the inmate." Id. "This may be done by the prison official articulating a legitimate, non-retaliatory reason for the adverse decision or action, which is clear, reasonably specific and worthy of credence." Id. "Once the prison official satisfies this burden of production, the inmate then has the burden of persuading the court by sufficient evidence that the proffered reason for the adverse decision is a pretext for retaliation." Id. A prisoner "must allege facts showing that the allegedly retaliatory conduct would not have occurred but for the retaliatory motive." Hempstead v. Carter, No. 5:06CV68/MCR/EMT, 2006 WL 2092383, *5-6 (N.D. Fla. 2006) (emphasis added) (citing Jackson v. Fair, 846 F.2d 811, 820 (1st Cir. 1988)). "[A] causal connection may be alleged by a chronology of events that create a plausible inference of retaliation. Id. (citing Cain v. Lane, 857 F.2d 1139, 1143 n. 6 (7th Cir. 1988)). However, "[t]he relevant showing . . . must be more than the prisoner's 'personal belief that he is the victim of retaliation.'" Id. (citing Johnson v. Rodriguez, 110 F.3d 299, 310 (5th Cir. 1997)).

"Federal courts must 'carefully scrutinize retaliation claims' which challenge the issuance of disciplinaries against prison inmates as prisoners often attempt to 'inappropriately insulate themselves from [such] actions by drawing the shield of retaliation around them.'" Flynn, 2006 WL 1236718, *5 (quoting Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir. 1995)). "Carefully

scrutinizing such claims is [necessary because prisoners'] . . . claims of retaliation are . . . easily

fabricated [and] pose a substantial risk of unwarranted judicial intrusion into matters of general

prison administration."  Id.  "This is so because virtually any adverse action taken against a

prisoner by a prison official - even those otherwise not rising to the level of a constitutional

violation - can be characterized [by the prisoner] as a constitutionally proscribed retaliatory act."

Id.

> In assessing retaliation claims, appropriate deference should be
> afforded to prison officials "in the evaluation of proffered
> legitimate penological reasons for conduct alleged to be
> retaliatory." Pratt v. Rowland, 65 F.3d 802, 807 (9th Cir. 1995)
> (citing Sandin v. Conner, 515 U.S. 472, 487, 115 S. Ct. 2293,
> 2299, 132 L. Ed. 2d 418 (1995)). And, because regulatory actions
> taken by prison officials are presumed to be reasonable, the inmate
> must produce "specific, nonconclusory factual allegations that
> establish improper motive causing cognizable injury. . . ."
> Crawford-El v. Britton, 523 U.S. 574, 598, 118 S. Ct. 1584, 1596-
> 97, 140 L. Ed. 2d 750 (1998) (internal quotation marks omitted).
> Indeed, while mindful that Plaintiff may not be held to a
> heightened burden of proof, see Crawford-El, 523 U.S. at 580-86
> (holding that in retaliation claim prisoner could not be required to
> show "clear and convincing" evidence of defendant's
> unconstitutional motives), courts should approach prisoner claims
> of retaliation "with skepticism and particular care" due to the "near
> inevitability" that prisoners will take exception with the decisions
> and actions of prison officials and "the ease with which claims of
> retaliation may be fabricated."

Hempstead, 2006 WL 2092383, *6 (citations omitted).

In this case, even assuming that Plaintiff has carried his initial burden of presenting prima

facie proof of retaliation, Defendant has clearly met his burden of demonstrating that the adverse

action about which Plaintiff complains resulted from his violation of an institutional rule. The

evidence shows that Plaintiff was charged with possession of a weapon and possession of

contraband after McCall found a piece of copper wire in Plaintiff's property bag.  In response,

Plaintiff offers only his conclusory allegation that Defendant McCall's action was retaliatory, basing his conclusion solely on his belief that the wire could not be used as a weapon. Plaintiff argued this at his disciplinary hearing, but the three hearing officers disagreed. (Doc. 1, p.7). As this court must carefully scrutinize retaliation claims arising from prison disciplinary actions and approach such claims "with skepticism and particular care," Hempstead, 2006 WL 2092383, * 6, Plaintiff's conclusory allegations are insufficient to show that the legitimate reason proffered by Defendant McCall is pretextual. Given the absence of any evidence that Plaintiff would not have been charged for possession of the copper wire "but for" the purpose of retaliation, Plaintiff's retaliation claim fails as a matter of law.

## IV.  CONCLUSION

Based on the foregoing, this Court **GRANTS** Plaintiff's motion to substitute Defendant Milton in place of Defendant Byrne as set forth hereinabove. The Court also concludes that Defendants' motion for summary judgment in their favor on any and all claims asserted against them by Plaintiff in this action is due to be **GRANTED**, that Plaintiff's motion for summary judgment is due to be **DENIED**, and hereby recommends that Plaintiff's complaint be **DISMISSED with prejudice.**

## V.  NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. See 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b); S.D. ALA. L.R. 72.4. In order to be specific, an objection must identify the specific finding or recommendation

to which objection is made, state the basis for the objection, and specify the place in the

Magistrate Judge's report and recommendation where the disputed determination is found. An

objection that merely incorporates by reference or refers to the briefing before the Magistrate

Judge is not specific.

     **DONE** this   14th   day of March, 2014.


                 /s/ Katherine P. Nelson
                 KATHERINE P. NELSON
                 UNITED STATES MAGISTRATE JUDGE